UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | |
| v. | § | CAUSE NO. 1:18-CR-00016-LY |
| | § § § | |
| CHARLES MCALLISTER | § § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR ACQUITTAL**

The United States of America, by and through its undersigned Assistant United States Attorneys, opposes Defendant Charles McAllister's Renewed Motion for Acquittal and submits that it should be denied because the overwhelming evidence presented at trial established Defendant's specific intent to defraud his customers of millions of dollars, which was more than sufficient to support the jury's verdict of guilty on all counts.

**I. BACKGROUND**

In 2018, a Grand Jury indicted Defendant for two counts of Wire Fraud in violation of 18 U.S.C. § 1343 and one count of Engaging in Monetary Transaction in Criminally Derived Property in violation of 18 U.S.C. § 1957. The Government proceeded to trial against Defendant on September 30, 2019. During trial, the Government presented more than sufficient evidence to establish the Defendant's guilt on all charges. The jury rendered a verdict of guilty on all counts on October 4, 2019.

1

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence or after the close of all of the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). In the case of a jury having already returned a guilty verdict, the Court may set aside the verdict and enter an acquittal. *Id*. at (c)(2).

However, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982). Because the evidence presented by the Government against the Defendant is sufficient to determine that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt, Defendant's motion for acquittal should be denied.

## III. ARGUMENT

The evidence presented by the Government regarding Defendant's specific intent to defraud was overwhelming, certainly more than sufficient for a reasonable trier of fact to find that the Defendant possessed the requisite intent.  "To prove wire fraud under 18 U.S.C. § 1343, the Government must prove: (1) a scheme to defraud, and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006) (citation and internal quotation marks omitted). In *United States v. Stalnaker*, the Fifth Circuit noted that "[w]ire fraud is a specific-intent crime requiring proof that the defendant knew that the scheme involved false representations which related to material information." 571

F.3d 428, 436 (5th Cir. 2009) (internal citations and quotation marks omitted). In the same case, the Fifth Circuit held that there was substantial circumstantial evidence from which a jury could conclude that the defendant possessed the requisite intent for her wire fraud conviction. *Id*. at 437.

At trial, the Government presented evidence that the Defendant formed and organized BDI without sufficient capital, without an adequate accounting system, without segregating customer funds or metals, and without investing in a company pool of metal. From almost the very beginning of the company's operation, Defendant began to take customer's metals, sell the metals, and use the proceeds for his business operations, all without notice to the customer. The Defendant also made misrepresentations on BDI's website, including the statements that the "product is exclusively allocated to your account portfolio," "you are purchasing individual products and not 'pool' metal," and "for your protection, stored products are not the assets of Bullion Direct."  Gov. Ex. 34.  Customer accounts on the BDI website were structured to lull customers into a sense of security by representing that BDI was holding specific types and amounts of metals for a client, omitting any reference to the fact that the metals were not actually held in the vault and that the Defendant considered them to be mere "obligations."  Gov. Ex. 151, p. 4.  Joe Martinec, one of the bankruptcy trustees, testified that more than one BDI customer told him they had personal telephone calls with the Defendant who reassured the customers that their metals were safely stored in the vault mere feet away from his office.

Without this influx of free money, Defendant's business would have failed.  Defendant did not perform any financial analysis of his company or file any tax returns for the first 10 years of operations.  When a financial analysis was finally performed in 2010, the undisputed evidence

proved that Defendant was notified his company owed its customers approximately $14 million beyond what it held in bank accounts or the vault, which was referred to by BDI employees as the "hole." The evidence proved that Defendant ignored the "hole" in 2010 and continued to store customer metals, continued using customer cash and metals for business expenses, and continued to lie to customers. The Defendant also ignored employee warnings that company assets were insufficient to cover metal deposited with BDI, that the shortfall would be a material amount, and that there was no segregation of customer cash and metal. Adding to the circumstantial evidence against the Defendant regarding his intent, the Government further showed that he ignored warnings that using customer funds to purchase a house and pay personal expenses was an irregular activity, and that the company was insolvent. Two of the company's top executives, Chief Operating Officer Jason Otteson and Controller Julie Mayfield,[1] resigned shortly after discovering the "hole" due to these concerns about the operation of the company. Some efforts were made to cover the theft from customers by seeking a buyer of the company or the company's patent, but the Defendant refused to share BDI's financial situation with potential purchasers, making any sale impossible. Defendant's refusal to share the financial situation with potential purchasers is evidence of his consciousness of guilt.

In September or October of 2012, the evidence further proved that the Defendant attended a meeting with his corporate counsel, Duggins Wren LLP, and three BDI employees, Julie Mayfield, Randy Russell, and Greg Russell. Paul Carmona, a new attorney with Duggins Wren, attended the meeting. Mr. Carmona had significant experience with civil fraud cases as

---

[1] Ms. Mayfield returned to work with the company as a contractor and later an employee after being asked to return by Defendant.

the former head of the Texas Attorney General's Consumer Protection Division.  Upon hearing a description of BDI's business, Mr. Carmona expressed concern that BDI was committing civil fraud, violating Texas's Deceptive Trade Practices Act, and potentially committing a crime.  Mr. Carmona advised Defendant and his employees that they should consult with criminal attorneys.  Julie Mayfield, Randy Russell, and Greg Russell sought advice from a criminal defense attorney in Austin, David Sheppard.  The evidence shows that Defendant retained a different criminal defense attorney in Austin, Randy Leavitt, paid for with a check from BDI.  Mr. Carmona also advised and recommended to the Defendant that he self-report his actions to both civil and criminal authorities because in Mr. Carmona's experience such self-reporting was looked on very favorably.  No such self-report was made.  Instead, when Julie Mayfield and the Russells, acting on advice from David Sheppard, asked for the company to disclose its actions to customers and shareholders, the undisputed evidence shows that Duggins Wren attorney Joe Cain, acting on behalf of BDI and Defendant, told the employees that the company would not be making any such disclosure and threatened them with a lawsuit if they revealed the company's actions on their own.  Mere days after the initial meeting with Mr. Carmona, Julie Mayfield, Randy Russell, and Greg Russell resigned their employment or contract with BDI.  Defendant, on the other hand, continued to operate the business for almost three more years until he filed bankruptcy in July 2015.

      The evidence further showed that during those three years after the meeting with Mr. Carmona in 2012, Defendant continued to steal from and defraud his customers.  At the time of Ms. Mayfield's resignation, BDI held in its vault approximately $11 million of customer metals.  When BDI filed bankruptcy, it had only a small fraction of that amount: approximately $650,000

5

of metal still in its possession.

The Government's evidence of a specific intent to defraud, summarized above, was overwhelming and certainly sufficient circumstantial evidence from which a jury could conclude that the Defendant possessed the requisite intent for his wire fraud convictions. Because the evidence was sufficient for his convictions under 18 U.S.C. § 1343, it was also adequate for his conviction under 18 U.S.C. § 1953.

The Defendant argues that he did not act with specific intent to defraud anyone because he acted within the bounds of what he believed was the contractual relationship between BDI and its customers, listened to corporate counsel, and made efforts to turn around "the failing business." The Defendant's arguments fail because the Government presented substantial circumstantial evidence at trial from which a jury could reject the defense arguments and conclude that the Defendant possessed the requisite intent for his wire fraud conviction. Moreover, even if one assumed those defenses to be true,[2] they would not negate the evidence of Defendant's specific intent to defraud. Even if Defendant believed he had the right to steal non-IRA metals stored with his company, that clause did not apply to stored IRA metals and

---

[2] There was ample reason for the jury to reject all three defenses on their face. Defendant's motion states for a fact that he believed he had the contractual authority to take people's money and metal and use it for business expenses, but the only evidence of that was Ms. Mayfield's testimony that Defendant told her he had that right. As Mr. Milligan testified, the single-sentence in the company's Terms of Service that Defendant claims he relied on applied only to non-IRA metals stored with BDI. It did not apply to stored IRA metals, nor did it permit Defendant to lie to customers about making metal purchases and pocket the money paid by customers. That single sentence was also contradicted by other terms in the Terms of Service that required BDI to purchase metals and that prohibited BDI from making transactions into or out of a customer's account. The jury had ample evidence and reason to reject the Defendant's rationalization for stealing from his customers as being anything close to a true belief.

Regarding Defendant's claim that he followed the advice of counsel, no such advice was ever proffered in evidence. This was one of the grounds on which the Court denied Defendant's request for an advice of counsel jury instruction, and would apply equally to the jury. Finally, a jury could easily conclude that Defendant's efforts to "save the business" via a sale to another company were not in good faith because he refused to release the company financials to any potential buyer, a necessary predicate to any realistic chance for a sale.

immediate shipment orders.  Thus it would not negate his specific intent to defraud the IRA storage customers, who were owed over $6 million when the bankruptcy was declared, despite the company only having approximately $650,000 in metals in its possession.  Nor would it negate his specific intent to defraud the two victims of the three counts in the indictment, both of whom requested immediate shipment and delivery of their purchases.  Defendant has not alleged that any attorney gave him advice that he could take customer metal, sell it, and use it to pay Defendant's salary, Defendant's bonuses, or any other company expenses, nor any advice that Defendant could agree to a customer purchase, accept payment, and then not deliver the metals as agreed, but instead use the funds to pay himself approximately $35,000 days before declaring bankruptcy.  Finally, efforts to find alternative ways to cover for his theft from customers is not evidence that he lacked the necessary intent.  If anything, it shows his awareness of his theft.

    The Government presented overwhelming evidence by which a reasonable trier of fact could find the Government had established the Defendant's specific intent, and thus his guilt, beyond a reasonable doubt. Because the Defendant cannot show that the Government presented insufficient evidence to establish his specific intent and guilt beyond a reasonable doubt, his

motion for acquittal should be denied.

                                    Respectfully submitted,

                                    JOHN F. BASH
                                    UNITED STATES ATTORNEY

By:    /s/ Keith M. Henneke
        KEITH M. HENNEKE
        DAN GUESS
        Assistant United States Attorneys
        903 San Jacinto Blvd., Suite 334
        Austin, Texas 78701
        A/C    512 463-8376
        FAX   512 916-5854
        State Bar No. 24054497

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 28th day of October, 2019, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System and thereby delivered to:

    JAMES ARDOIN
    Attorney for Defendant Charles McAllister

    /s/ Keith M. Henneke
    KEITH M. HENNEKE
    Assistant United States Attorney