# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
February 2, 2021
Lyle W. Cayce
Clerk

No. 20-50141

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

CHARLES MCALLISTER,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CR-16-1

_____

Before HAYNES, DUNCAN, and ENGELHARDT, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and the briefs on file.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

**A True Copy**
**Certified order issued Feb 24, 2021**

*Lyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

Case: 20-50141 Document: 00515755302 Page: 2 Date Filed: 02/24/2021

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
February 2, 2021
Lyle W. Cayce
Clerk

No. 20-50141

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

versus

CHARLES MCALLISTER,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CR-16-1

Before HAYNES, DUNCAN, and ENGELHARDT, *Circuit Judges.*

PER CURIAM:*

Charles McAllister was unanimously convicted following a five-day jury trial of aiding and abetting wire fraud in violation of 18 U.S.C. § 2 and § 1343 and unlawfully engaging in a monetary transaction in violation of 18 U.S.C. § 1957 arising out of his online precious metals trading business. McAllister appeals his conviction, challenging the sufficiency of the evidence

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

of his intent to defraud, and contends that the district court erred in denying his motions for judgment of acquittal. We AFFIRM.

I.

Charles McAllister was the CEO and majority shareholder of Bullion Direct, Inc. ("BDI"), the company he founded in 1999. BDI was an online platform that facilitated the trading of precious metals. "Nucleo" was BDI's trademarked exchange sale, allowing a buyer and a seller of bullion to remain anonymous while using the proprietary platform, with BDI acting as intermediary, to buy/sell precious metals. BDI earned a one-percent commission after allegedly verifying the legitimacy of metals before completing the sale. BDI also offered its customers storage for precious metals in its vault for no additional charge.

The FBI opened an investigation into BDI in July 2015 after receiving a complaint from a former customer who had wired almost $100,000 to BDI to obtain precious metals, but received nothing in return. Shortly thereafter, BDI declared bankruptcy. The FBI investigation ultimately concluded there were over 6,000 victims and approximately $25 million in lost funds. McAllister was indicted in January 2018 for creating and using companies between January 2009 and July 2015 to devise a scheme to defraud and obtain money and property by means of false and fraudulent pretenses, representations, or promises.

During McAllister's trial, the jury heard from a dozen witnesses who described in detail the FBI investigation, the origins of BDI, BDI's inner workings as a company, inadequate accounting procedures, the lack of proper vault inventory, misappropriation of customer funds, and personal stories of customers being defrauded by BDI.

FBI Agent David Hall described how BDI operated, and how the case against McAllister originated based on a complaint. Hall detailed how

customers made an account, the various fund transfers utilized by BDI, and the precious metals represented as available to customers.

Julie Mayfield, who was hired by BDI in 2000 to assist with accounting, provided testimony regarding the inner workings and problems at BDI. Specifically, she testified that shortly after her hire, she noted company accounting software was ill-equipped to handle business demands, and that the nucleo platform inaccurately recorded all user transactions as sales, whether they came from catalog sales or through the exchange. Mayfield testified that McAllister was the sole decision making authority at BDI.

Mayfield further testified that no operating expenses were recorded in accounting at BDI until 2009 and that BDI never filed income tax returns from the time of her hire in 2000 until 2012, a concern that she raised with McAllister via email. Tax returns ultimately revealed that BDI was $14 million in debt and that McAllister had not only reimbursed himself for company expenses used on his personal credit card, but he had over-reimbursed himself by more than $500,000. Mayfield also discovered that McAllister wired funds to himself from BDI accounts to purchase a home for $925,000.

Mayfield, along with McAllister and other BDI representatives, met with tax attorneys in October 2012. On the same day, she met with a criminal defense attorney. Mayfield testified that, upon receiving advice from criminal defense counsel, she told McAllister and BDI counsel that they needed to inform customers that their metal was not in fact in BDI vaults, and to stop vaulting customer metal. Mayfield resigned after BDI Counsel, Joe Cain, stated they would not notify customers and any customer disclosure would likely be met with lawsuits.

No. 20-50141

Greg Russell, who was involved with the company from 2011 to 2012 as a consultant to help BDI financially diversify through hedging, testified the only way to fix the financial issues for BDI was through an acquisition of the company. He explained that discussions for financial solutions with McAllister, the sole authority at BDI, never materialized because McAlister was unwilling to disclose financial information.

Paul Carmona, director of the Regulatory Integrity Division at the Texas Workforce Commission, testified that he recommended BDI consult criminal defense counsel after estimating BDI's operation was likely illegal. When Carmona pressed if BDI had enough metal to satisfy its customer obligations, he was told that it did not.

Joseph Martinec, a Texas bankruptcy attorney, testified that he had been retained by McAllister in 2012. In 2015, McAllister informed him that he had to do something after being unable to return to the office because of frustrated customers and process servers. Martinec recommended that McAllister hire a chief restructuring officer after concluding that BDI operations could not continue due to lack of money. He noted McAllister retained sole authority over BDI, that BDI operated a net loss of $17 million over its first ten years of existence, and customers repeatedly stated they believed bullion was in the vault because McAllister told them it was. Martinec testified that at the time of bankruptcy, the estimated vault inventory was worth $700,000, and BDI had $25 million in obligations.

Greg Milligan investigated litigation claims on behalf of the creditor's trust, and as such, described his investigation into BDI. He testified that in BDI's fifteen years of operation, it funded operating losses, including salaries, software development, and primary operating expenses through the use of customer metals. He noted that prior to filing the bankruptcy petition, McAllister paid himself $35,874 in severance, used company funds to

4

purchase a home, and after Mayfield left BDI, never hired another credentialed Certified Public Accountant.

Agent Michael Fernald, a special agent with the Criminal Investigation Division of the IRS, described his investigation of McAllister and BDI. He testified to the lack of financial records between 2012 and 2015, that BDI misappropriated $16 million in customer funds between 2009 and 2015, and that between 2010 and 2015, McAllister paid himself $1.7 million and over-reimbursed himself $514,000.

At the conclusion of the five-day trial, the jury unanimously found McAllister guilty of wire fraud and engaging in monetary transactions in criminally derived property. McAllister moved unsuccessfully for acquittal. The district court imposed a concurrent, below-guidelines sentence of 120 months and restitution in the amount of $16,186,212.56. McAllister timely appealed.

II.

McAllister argues that the district erred in denying his motions for acquittal as there is insufficient evidence of intent to convict of the charged offenses. We review the sufficiency of the evidence de novo, but our review is "highly deferential to the verdict." *United States v. Carbins*, 882 F.3d 557, 563 (5th Cir. 2018) (quoting *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017)). We must "determine whether, viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt." *Id.* (quoting *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016)). We must affirm his convictions if any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. *See United States v. del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019).

No. 20-50141

III.

To prove wire fraud, the Government must establish both a scheme to defraud and a specific intent to defraud. *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018). Conspiracy to commit wire fraud likewise requires that the defendant join the conspiracy with the "specific intent to defraud." *United States v. Brooks*, 681 F.3d 678, 700 (5th Cir. 2012).

The elements of wire fraud are: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud. *Spalding* 894 F.3d at 181 (5th Cir. 2018). The elements of money laundering, specifically, engaging in a monetary transaction in criminally derived property in violation of 18 U.S.C. § 1957 are: (1) engaging in or attempting to engage in a monetary transaction; (2) in criminally-derived property that is of a value greater than $10,000; (3) knowing that the property is derived from unlawful activity; and that (4) the property is in fact derived from specified unlawful activity. *United States v. Loe*, 248 F.3d 449, 468 (5th Cir. 2001). Aiding and abetting occurs when the defendant "aids, abets, counsels, commands, induces[,] or procures" the commission of a federal offense. 18 U.S.C. § 2(a).

To establish that McAllister engaged in a scheme to defraud, the Government must prove that he "made some kind of a false or fraudulent material misrepresentation." *Spalding*, 894 F.3d at 181. Misleading omissions qualify as false representations. *See Pasquantino v. United States*, 544 U.S. 349, 357 (2005). As for intent to defraud, this element is satisfied "when [a defendant] acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018) (quoting *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir.

2014)). A jury can infer intent from the facts and circumstances. *United States v. Rivera*, 295 F.3d 461, 466-67 (5th Cir. 2002).

Viewing the evidence and drawing all reasonable inferences in the light most favorable to the verdict, we conclude that the evidence was sufficient to support McAllister's convictions for aiding and abetting wire fraud and unlawfully engaging in a monetary transaction.

First, a reasonable jury could conclude that McAllister engaged in a scheme to defraud. Multiple witnesses testified that McAllister was the sole decision maker at BDI and was using BDI funds for personal use, including purchasing a home. Mayfield testified that McAllister was aware that BDI software was ill-equipped to handle business demands and BDI wasn't keeping proper records or filing tax returns for ten years. She also testified that after consulting with a criminal defense lawyer and recommending to McAllister and others the need to notify customers, she was threatened with legal action. Russell testified that McAllister was aware of financial trouble, but refused to share financial information about BDI. And Agent Fernald testified that BDI had misappropriated customer funds.

McAllister argues that he was only trying to accomplish his intent to create an "eBay for coins," but lacked financial and accounting skills, so he hired experts and relied upon them to his detriment. Even assuming his explanation somehow refutes the Government's evidence and testimony presented at trial, a jury was entitled to reject that explanation. *See Spalding*, 894 F.3d at 181.

Second, a jury could reasonably infer McAllister's intent to defraud from the facts and circumstances. *See Rivera*, 295 F.3d at 469. McAllister was the sole authority at BDI until he relinquished control after the company declared bankruptcy. Viewing the evidence most favorably to the verdict, McAllister was aware of serious financial issues at BDI, didn't file tax returns

as decision maker at BDI, purchased a home with company funds, and over-reimbursed himself by $500,000 from company funds. McAllister also informed his retained bankruptcy counsel that he couldn't go into the office because of frustrated process servers and customers. Lastly, after Mayfield resigned, McAllister never hired another qualified, credentialed accountant to help with addressing the financial issues at BDI. Considerable evidence supports the jury's conclusion that McAllister was not merely negligent or naïve, as he suggests,[1] but rather that he intended to commit the offenses alleged.

Viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crimes have proven beyond a reasonable doubt. Accordingly, there was sufficient evidence to convict McAllister of aiding and abetting wire fraud and unlawfully engaging in a monetary transaction.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[1] McAllister argues that he was just trying to keep his business going. But that is also true of all Ponzi scheme overseers: they would like the scheme to continue as long as possible.

# United States Court of Appeals
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 24, 2021

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 20-50141   USA v. McAllister
                        USDC No. 1:18-CR-16-1

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Roeshawn Johnson, Deputy Clerk
                        504-310-7998

cc:  Mr. Joseph H. Gay Jr.
     Mr. Charles McAllister
     Mr. Anthony James Rodregous