FILED
April 15, 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____DM_____
DEPUTY

## No. 1:18-CR-00016-LY-1

IN THE
UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS, AUSTIN DIVISION

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

CHARLES MCALLISTER,
Defendant-Appellant.

———————

### APPELLANT'S EMERGENCY APPLICATION
### FOR CONTINUED RELEASE ON BOND PENDING APPEAL

———————

TO THE HONORABLE COURT:

Defendant-Appellant Charles McAllister files this emergency Application for Release on Bond Pending Appeal. McAllister was given **less than 18 hours notice** that he is scheduled to report to Montgomery FPC today at **2:00 PM CDT on April 15, 2021**.[1] In light of the communications issue prompting the emergency status of this request, the COVID-19 pandemic and its effect on court proceedings, no hearing is requested. In support of this motion,

---

[1] *Prior to the filing of this Motion, the court previously granted McAllister's Application for Release on Bond during the Direct Appeal process*

McAllister would show the Court as follows:

I.      **Introduction**

McAllister was indicted for the offenses of: (1) fraud by wire, radio, or television and aiding and abetting in violation of 18 U.S.C. § 1343 (two counts); and (2) engaging in monetary transactions in violation of 18 U.S.C. § 1957 (one count). Docket Sheet at 2. McAllister pleaded not guilty and this Court released McAllister on pre-trial bond with minimal supervised release restrictions. Doc. 12, 18. After a multiple day trial, McAllister was eventually convicted on all counts and sentenced to concurrent 120-month terms of imprisonment to be followed by concurrent three-year terms of supervised release. Docket Sheet at 9. The Court further ordered McAllister to pay $16,186,212.56 in restitution. Docket Sheet at 9. McAllister timely perfected his appeal to the Fifth Circuit Court of Appeals after the entry of the Court's judgment.

**II.      The Bail Reform Act Permits McAllister's Release on Bond Pending Appeal**

The Bail Reform Act provides that a person who has been convicted and sentenced to a term of imprisonment may be released pending appeal if the court finds:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . and

> (B) that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in—
>
> > (i) reversal,
> >
> > (ii) an order for a new trial . . .

18 U.S.C. § 3143(b). McAllister asks this Court to continue his release on bond pending the resolution of his appeal. The Bail Reform Act permits his release pending appeal given that: (1) there is clear and convincing evidence that he is not likely to flee or to pose a danger to any other person or the community; and (2) his appeal is not for purposes of delay, but raises a substantial question likely to result in reversal or a new trial. See 18 U.S.C. § 3143(b). Because McAllister meets the conditions for release pending appeal, he now asks this Court to continue his release on bond pending the outcome of his appeal.

### III.     McAllister Is Neither a Risk of Flight Nor a Danger to Others or the Community

The clear and convincing evidence before this Court establishes that, if released, McAllister is not likely to flee or to pose a danger to any other person or the community. McAllister was released on bond at his initial appearance, appeared when required, complied with the conditions of pretrial release, and has remained released on bond following his sentencing without issue. McAllister has everything to lose, and nothing to gain by fleeing. With his appeal pending, McAllister has the hope of avoiding a criminal sentence altogether.

As for any potential danger to other persons, or the community, there is none. The parameters of McAllister's prior terms of supervised release do not reflect any indication that this Court believed McAllister posed a danger to others. And, McAllister's compliance with these previous conditions show that he is capable to adhere to these same terms if permitted to be continued on bond pending appeal. In sum, these factors support the conclusion that McAllister should be continued on bond pending the resolution of his appeal.

IV.     **McAllister's Appeal Is Not for the Purpose of Delay, But Instead Raises a Substantial Question Likely to Result in Reversal**

Continuing the appeals process as a pro se movant, McAllister will file a motion under USC 28 section 2255 to vacate the conviction, sentence, and restitution on the ground that the sentence was imposed in violation of the Fifth Amendment of the Constitution of the United States and is subject to collateral attack because my attorney James Ardoin III provided such poor representation as to amount to ineffective assistance of counsel. For example, McAllister's counsel failed to call any defense witnesses to challenge the Government's witnesses and exhibits. McAllister's counsel also failed to understand the financial exhibits and information. In one important instance, this deficiency actually helped falsely bolster the Government's case. McAllister will show how these errors, individually and in combination, affected the outcome of the verdict, the sentence, and restitution. In addition, McAllister's counsel failed to dedicate sufficient

attention to the case while going through a divorce, employment change, and his own defense as a defendant in an illegal gambling ring.

The finding that an appeal poses a substantial question likely to result in reversal or a new trial does not mean that the district court must conclude that its own rulings are likely to be reversed. United States v. Valera-Elizondo, 761 F.2d 1020, 1022 (5th Cir. 1985). Rather, the court must determine: (1) that the question raised on appeal is substantial; and (2) that the question is sufficiently important to the merits that an appellate ruling favorable to the defendant is likely to require reversal or a new trial. Id. (citing United States v. Miller, 753 F.2d 19, 23 (3d Cir. 1985)). A question is "substantial" if it "raise[s] a substantial doubt . . . as to the outcome of its resolution." Valera-Elizondo, 761 F.2d at 1024. It is likely to result in reversal or a new trial if "it is more probable than not" that a ruling favorable to the defendant will require reversal or a new trial. Id. at 1025.

In this case, McAllister's appeal presents the substantial question as to the sufficiency of the evidence to support his convictions. As noted in McAllister's Motion for Acquittal, Doc. 78, it is McAllister's position that the Government failed to establish that he acted with the specific intent to defraud anyone. Doc. 78. Despite the lack of sufficient evidence of specific intent, the jury nonetheless rendered a verdict of guilty on all counts on October 4, 2019. Doc. 78.

As McAllister urged at the close of the Government's case, he believes the Government failed to present sufficient evidence that he acted

5

with the necessary intent to commit fraud. "Wire fraud is a specific-intent crime requiring proof that the defendant knew [he was participating in a] scheme [that] involved false representations . . . related to material information." United States v. Stalnaker, 571 F.3d 428, 436 (5th Cir. 2009). Here, McAllister did not intentionally and knowingly engage in a scheme to defraud. Instead, he acted within the bounds of what he believed was the contractual relationship between BDI and its customers. Doc. 78. The BDI terms of service in effect from January 1, 2000 to July 15, 2011 stated: "Upon delivery of commodities for Customer to Depository, Customer will receive title to an undivided share of the commodities so held. Notwithstanding the passage of title to Customer, Bullion Direct may use or act as if it were the owner of the commodity held for Customer." Doc. 78; Ex. G25. The testimony was clear McAllister believed that this provision of the BDI Terms of Service allowed him to make use of BDI's customers' metals with the understanding that BDI was then contractually obligated to its customers. Doc. 78.

Moreover, this was not hidden from BDI's customers. Doc. 78. It was not only written in the Terms of Service, but also part of BDI's website, which stated:

> Stored product is not physically segregated to each individual customer. However, through the system of accounts, product is exclusively allocated to your account portfolio . . . .

Doc. 78; Ex. G-34.

6

During trial, the Government simply failed to establish that McAllister acted with specific intent to defraud anyone. Doc. 78. In fact, the evidence established McAllister believed he had the legal and contractual authority based on Bullion Direct, Inc.'s ("BDI") terms of service to use customers' stored metal until such time as the customer called on BDI to ship the metal or make payment to the customer for the value of the metal stored. Doc. 78. The evidence established that, when that legal and contractual authority was called into question in late September/early October 2012, McAllister consulted with legal counsel, after which he made two substantial changes to his business model directly related to use of customers' stored metal. First, BDI changed its terms of service and required customers to take immediate delivery instead of storing metal with BDI. Ex. G-35. Second, BDI stopped engaging in new transactions with IRA customers, except to allow IRA customers to sell what they already had in their portfolio. Doc. 78; Ex. G-45. These actions reflect the substance of advice in the draft memorandum from BDI's corporate counsel during this timeframe: essentially, that if BDI did not continue to store metals, disclosure of its financial condition to customers was not required under Texas law. Doc. 78; Ex. D-4. Indeed, both Julie Mayfield and Greg Russell testified that BDI's corporate counsel—not McAllister—was the one who made the decision that BDI would not make disclosure to its customers. The only possible conclusion from this evidence is that McAllister sought and followed the advice of BDI's counsel.

There is insufficient evidence demonstrating that McAllister intended to perpetrate a fraud. Doc. 78. Julie Mayfield, the one witness who had been with McAllister from the beginning of his business, testified she did not believe he started the business to defraud anyone. Doc. 78. The Government attempted to have her walk back this testimony, but Ms. Mayfield acknowledged that she had made a similar statement under oath to the Commodity Futures Trading Commission in 2016. Doc. 78. In fact, the Government's own evidence demonstrated that BDI discouraged long-term storage, encouraged customers to take periodic delivery, and advised customers that if they "require[d] long-term, segregated, or allocated storage arrangements," they should "simply request physical delivery to one of [several] independent storage options . . . ." Doc. 78; Ex. G-34. Thus, BDI's offer of free storage to its customers was likely a bad business decision, but the evidence contradicts the Government's position at trial that it was part of a scheme to defraud. Doc. 78.

Moreover, there was copious testimony about all the efforts McAllister took to turn around the failing business. Doc. 78. Julie Mayfield's testimony established McAllister hired people with expertise in accounting to evaluate the company's accounting needs and implement a sustainable, functioning accounting system. Doc. 78. Ms. Mayfield also testified McAllister sought out would-be buyers and licensees for his patent to cover the obligations' deficit—a patent she understood had been valued at millions. Doc. 78. Greg Russell testified McAllister implemented

hedging strategies to prevent the obligations deficit from growing. Doc. 78. Further, the evidence established that in the years from 2012 to when BDI filed for bankruptcy in 2015, McAllister had successfully shrunk the obligations deficit from $41 million to $23.5 million—a decrease by $17.5 million in obligations. Doc. 78; compare D-5 with G-140. Indeed, even using the Government's numbers from trial (which McAllister disputes), BDI did nearly three-quarters of a billion dollars in gross sales over its history; making its bankruptcy losses just over 3%. Doc.78. Finally, the Government's evidence also established McAllister continued to purchase metal to fulfill customer obligations for as long as it was in operation. Doc. 78; G-164. The evidence establishes that rather than intending to perpetrate a scheme to defraud, McAllister did everything he could to turn the business around. Doc. 78. Thus, there was insufficient evidence at trial that McAllister acted with the specific intent to defraud his customers. Doc. 78. McAllister's appeal therefore presents a substantial question that is likely—indeed, more than likely—to result in reversal. See Valera-Elizondo, 761 F.2d 1024.

**V.     McAllister Asks This Court to Continue His Release on Bond Pending the Resolution of His Appeal**

McAllister should be continued to be released on bond pending the resolution of his appeal under the provisions of the Bail Reform Act because: (1) he poses neither a danger to the community nor is a risk of flight; and (2) his appeal is not for purposes of delay, but instead poses a

substantial question likely to result in reversal. In addition, McAllister urges this Court to grant his Motion in the interest of justice given the recent COVID-19 pandemic. The scientific consensus is that incarcerated populations at are high risk for contracting and having serious complication from COVID-19. The current COVID-19 crisis thus presents exceptional reasons why this Court should allow McAllister to be continued on bond pending his appeal.

These are exceptional times and the immediate incarceration of McAllister, who poses no risk of flight or danger to public safety, is inappropriate. As the Court is no doubt aware, global health officials and the CDC agree that COVID-19 is a pandemic. As of March 28, 2020, the locale where McAllister is set to be imprisoned, the total confirmed cases of COVID-19 has risen to nearly 24,000 with over 10,000 deaths in the state. See https://bao.arcgis.com/covid-19/jhu/county/01101.html (last visited April 14, 2021).

Even as the BOP does what it can to prevent the spread of COVID-19 through the facilities, it appears inevitable that the virus will spread throughout the prisons--and that if it does, the situation will quickly turn dire. See Federal prison workers say conflicting orders on coronavirus response is putting lives at risk, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federalemployees-say-conflicting-orders-putting-lives-at-risk-2020- 03-19; Danielle Ivory, "We Are Not a Hospital: A Prison Braces for the Coronavirus," N.Y. Times,

10

March 17, 2020, https://tinyurl.com/se7emva. The BOP's protocol has no allowance for testing. See BOP Implementing Modified Operations, available https://www.bop.gov/coronavirus/covid19_status.jsp.

As of today, the BOP reports at least fourteen positive cases of COVID-19. See https://www.bop.gov/coronavirus/ (last visited March 28, 2020). Meanwhile the BOP is continuing to transfer inmates between facilities and given that symptoms don't begin to appear for weeks, this too means that the BOP is playing a game of catchup like most local communities. Medical professionals behind bars are sounding the alarm as well. Craig McCarthy, "Top Rikers Doctor: Coronavirus 'Storm is Coming,'" N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can.").

McAllister suffers from Obstructive Sleep Apnea. He believes this respiratory condition could potentially subject him to a higher risk of catching COVID-19. In addition, 38% percent of hospitalizations are adults under the age of 54. Pam Belluck, "Younger Adults Make Up Big Portions of Coronavirus Hospitalizations," N.Y. Times (Mar. 18, 2020). McAllister thus believes he falls within the CDC's more vulnerable band of people and asks this Court to weigh these consideration when deciding whether to continue him on bond. See, e.g., United States v. Dante Stephens, 15-CR-

11

95(AJN), ---F.Supp.3d---, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (reconsidering defendant's bond request and granting it in light of COVID-19 pandemic); see generally United States v. Dempsey, 19-CR236-JB-1 (S.D. Al. March 19, 2020) (sentencing 74-year-old defendant to five years of probation despite 30-month low end guideline range); United States v. Guevera-Miranda, et al., 18- CR-00449-HZ (D. Or. March 16, 2020) (varying from bottom of guideline range, 12 months, to 3 years' probation and 8 months of house arrest due to pandemic).

For the reasons outlined above, McAllister asks this Court to continue his release on bond pending appeal. Further, if this Court grants this request, McAllister is unopposed to the imposition of any additional conditions as directed by the Probation Department to ensure his compliance during the duration of his appeal process.

## VI. The Government Is Likely Opposed to this Motion

I have not conferred with opposing counsel regarding this request due to the emergency nature of the request. The Government was opposed to McAllister's prior request, which was granted by this court.

Respectfully Submitted,

/s/ *Charles H. McAllister*

Charles H. McAllister, Pro Se

1550 Opelika Road #6-143

Auburn, AL 36830

12

Tele: 512.626.2949

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT, AUSTIN DIVISION OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES** | § | **NO.1:18-CR-00016-1** |
| | § | |
| **VS.** | § | |
| | § | |
| **CHARLES MCALLISTER** | § | |

### ORDER ON DEFENDANT-APPELLANT'S APPLICATION FOR CONTINUED RELEASE ON BOND PENDING APPEAL

On this \_\_\_\_ day of _____ 2020, this Court considered the Defendant-Appellant's Application for Continued Release on Bond Pending Appeal. This Court finds that the Defendant-Appellant's Application is hereby:

DENIED _____

GRANTED _____

14

_____
JUDGE PRESIDING