UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHARLES McALLISTER,
 Movant,

v.

UNITED STATES OF AMERICA,
 Respondent.

CASE No. A-22-CV-225-LY-ML
[A-18-CR-16(1)-LY]

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOVANT'S § 2255 MOTION

**COMES NOW** Charles McAllister, pro se, with a REPLY to the Government's Response to Movant's §2255 Motion claiming ineffective assistance of counsel.

### INTRODUCTION

The Government was allowed to dress-up a complex Ch. 11 bankruptcy as a "Ponzi-like" criminal case because counsel failed to put on a case or make a meaningful challenge to impeach the Government's assumption-based case. Had Ardoin not failed to: (i) investigate and hire financial experts [See: Claims 1 and 2]; (ii) secure and use defense witnesses [See:

1

Claim 3]; (iii) use important exculpatory evidence [See: Claim 4]; and (iv) allow McAllister to testify on his own behalf [See: Claim 6], the changed evidentiary picture and true factual narrative would of prevailed to show McAllister did not, nor intend to, misappropriate customers funds.

The Government argues that McAllister's ineffective assistance of counsel claims should be denied because "Ardoin provided an affidavit" [that contains significant misrepresentations and delayed the Government's response by (4)four months] "in which he describes in detail" [using only generalizations and does not include any dates or reference any supporting documentation] "how he and his trial team" [while there was no "'team' of lawyers" as Ardoin described] "including his investigator" [who was hired for $1,500 a mere (5)five weeks before trial and specialized in sex and human trafficking, not financial fraud] "prepared McAllister's case by interviewing and attempting to interview witnesses" [which is refuted by defense witnesses and other evidence], "'meeting' with a potential expert" [which was only one 'call' made unreasonably late and without any meaningful investigatory or financial information provided], "reviewing voluminous discovery" [Ardoin claims he 'almost assuredly' and 'easily' reviewed millions of documents in a fraction of a second each], "and attempting" [with a couple subpoenas] "to locate exculpatory documents" [but failed to use exculpatory documents already in his possession including Julie Mayfield's letter and Agent Fernald's own work product to impeach their testimony].

2

Furthermore, the Government argues that "Ardoin explains that he did <u>challenge</u> the Government's financial analysis..." [although he failed to make a **meaningful** challenge to <u>**impeach**</u> the Government's assumption-based financial analysis using important evidence including exculpatory evidence of Agent Fernald's own work product, the margin reporting system, and actual transaction data]. [comments and emphasis added]

LEFT BLANK INTENTIONALLY

LEFT BLANK INTENTIONALLY

LEFT BLANK INTENTIONALLY

**REPLY TO: Ardoin's Affidavit**

Jimmy Ardoin makes misrepresentations that raise important questions of fact that need to be resolved in an evidentiary hearing. These misrepresentations include:

**A Ghost "Team of Lawyers"**

Ardoin states that he had a "team of lawyers, including one associate" working on the case but the attached invoices show that it was only Ardoin and one associate lawyer billing time. This was a complex financial case however he did not include any legal financial experts on his "team" nor is there any evidence of other lawyers working on the case.

**Ardoin 'Almost Assuredly' Investigates**

Ardoin states he "**almost** assuredly" and "easily" spent more than 400 hours reviewing discovery materials including "all [millions of] documents" however billing records only account for approximately 200 hours. Even if Ardoin's claim was true (that he has no record of half his time), mathematical evidence shows the impossibility to have reviewed "all documents" in less than a second each. Discovery of firm records will show how much time Ardoin actually spent reviewing discovery materials.

Ardoin states he hired an investigator who "thoroughly investigated"; "attempted to contact every witness"; and "was with [him] at trial." However, records will show she was only 'with [him]' during jury selection and could not be contacted when needed, just as McAllister claims. Defense witness affidavits show that witnesses were willing and available to

4

testify however they were never contacted, interviewed, or asked. Furthermore, the attached check shows the investigator was: paid only $1,500; hired just 5 weeks before trial, and; not provided sufficient resources (including time) to reasonably or thoroughly investigate. The Government and Ardoin do not dispute the timeline or the investigator's lack of credentials and specialization which a reasonable or thorough investigation requires.

### All 3 Defense Witness Affidavits Conflict With Ardoin's

Ardoin states that he and his investigator, Rebecca Beavers, interviewed Brad Plies and Plies "did not want to testify" and "would only help...[reconstruct] the database." However, Plies' states that he has "<u>no recollection of any 'interview' with Mr. Ardoin, his investigator, or a 'Rebecca Beavers.'</u>" In their single communication thread, Plies was asked about accessing the data and he offered to help with access including the Summary and Margins Report, the Transaction Detail Report, etc. Plies also states that he was "willing and able to testify on behalf of Charles McAllister". But, even as Ardoin admits, Plies was never contacted again.

Ardoin states he and his investigator attempted to make contact with Natasha Bernal however Bernal states "If [she] had been given the opportunity [she] would have testified for Mr. McAllister". In her affidavit, Ms. Bernal goes into great detail how she would have helped with the investigation and testimony for McAlliste. Discovery and other evidence, including communication records, will confirm Ardoin and his

5

'investigator' did not make a reasonable effort to contact or interview Ms. Bernal, Mr. Irmen, or other witnesses. Discovery of the investigator's communication records, reports (if exist), notes, and testimony from other potential witnesses will show that the investigator was ineffective, unqualified, and unavailable at trial.

### Personal And Professional Failures Piling Up

Ardoin states that there was no "messy" divorce and that he wasn't distracted by the gambling lawsuit naming him and the firm however a year-long child custody battle and a lawsuit involving the District Attorney's Office are both, by their very nature, significant distractions. Discovery and review of court and firm records will show how much time Ardoin was spending on his own personal, professional, and legal issues at the same time he represented McAllister. The Government and Ardoin do not dispute the timeline or events, only whether they were distractions.

### Ardoin 'Checks' Another Box

Ardoin states he had **one** conversation with **one** potential expert witness however, because Ardoin had not investigated or come to an understanding of the case, an expert could not have reasonably offered an opinion even if the late call wasn't a factor. Discovery will show <u>when</u> this one conversation took place and what information, if any, was provided.

Finally, and most compelling, is that Ardoin does not dispute McAllister's timeline of events including: (i) Judge Yeakel's warning about underestimating the time required to

6

prepare for a complex financial case; (ii) the late hire of Rebecca Beavers and her lack of credentials; (iii) the late attempt to contact an expert witness; and (iv) the timing of his personal, professional, and legal issues.

For the reasons above and the conflicting affidavits, an evidentiary hearing and appointment of counsel should be ordered.

LEFT BLANK INTENTIONALLY

**REPLY TO: Arguments and Authorities**

The Government refers to the 'Strickland Standard' which has a two prong 'test': performance and prejudice.

**PERFORMANCE**

Under Strickland, "counsel's representation [must fall] below an objective standard of reasonableness" to be ineffective. When evaluating the 'performance' prong of Strickland, the Court should consider professional norms and objective standards of reasonableness found in the American Bar Association and The Texas Rules of Professional Conduct.

In particular, the following excerpts:

Texas Rules of Professional Conduct

Rule 1.01 **Competent Diligent Representation**

(b)(2) In representing a client, a lawyer shall not frequently fail to carry out completely the obligations that the lawyer owes to a client.

(7. Neglect) Perhaps no professional shortcoming is more widely resented than **procrastination**. [emphasis added]

Rule 1.06 **Conflict of Interest**

(4. Conflict with Lawyer's Own Interests) Loyalty to a client is impaired not only by the respresentation of opposing parties...but also in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the lawyer's own interests or responsibilities to others. [i.e. Ardoin's own personal, professional, and legal issues]

American Bar Association - Defense Function Standards

**Appropriate Workload**

(4-1.8a) Defense Counsel should not carry a workload that...interferes with providing quality representation, endangers a client's interest in independent, thorough, or speedy representation, or has a significant potential to lead to the breach of professional obligations. [i.e. Ardoin's own personal, professional, and legal issues]

**Duty to Investigate and Engage Investigators**

(c) Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that

8

reasonably might lead to information relevant to the merits of the matter.... [i.e. Judge Yeakel's warning to Ardoin regarding underestimating time needed to prepare] Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing and re-evaluation of physical, forensic, and expert evidence).... [i.e. Agent Fernald's assumption-based financial analysis]

**PREJUDICE**

With respect to the 'prejudice' prong of Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." There is a reasonable probability that the verdict, sentence, or restitution amount would have been different when considering the changed evidentiary picture resulting from the impeachment of Agent Fernald's assumption-based financial analysis, Julie Mayfield's letter, and other issues identified in McAllister's claims.

The most prevalent harm to McAllister involves the false assumption-based financial analysis used as the Government's basis for the customer's loss and misappropriated funds which then became the foundation of the Government's case.

Additionally, confidence in the finding of all three charges is undermined by the facts outlined in Natasha Bernal's affidavit and the bankruptcy inventory records. Furthermore, confidence in the Government's characterization

of McAllister's intent is undermined by the content and timing of Julie Mayfield's exculpatory letter.

And Finally, the level and amount of Government misconduct and misrepresentations are by themselves prejudicial. These include: the "very conservative" assumption-based financial analysis; nancial analysis; "no margin report"; "no margins on catalog orders"; Julie Mayfield's letter; the false house photos; the missing cloud emails and documents; and the false enrichment slide showing "3 land cruisers" and lacking payroll deductions from Insperity. All these examples and McAllister's claims show that the confidence in the outcome of the verdict, the sentence, and the restitution are undermined.

**EVIDENTIARY HEARING**

"If a petitioner alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim." Holmes v. United States, 876 F.2d 1545, 1552 (11th Cir. 1989). McAllister alleges many facts that would require an evidentiary hearing including: (i) the documentary evidence of Agent Fernald's misrepresentations and misconduct regarding the Government's assumption-based financial analysis [See: Exhibit B]; (ii) evidence in the record showing a financial recovery began in 2011; (iii) evidence of a margin reports and a robust reporting system [See: Plies Affidavit; Attached screen shot]; (iv) Julie Mayfield's exculpatory letter [See:

Exhibit A]; and (v) clashing affidavits refuting Ardoin's many misrepresentations in his affidavit. [See: Affidavits and REPLY TO: Ardoin's Affidavit] Recent case law finds that clashing affidavits require an evidentiary hearing. [See: Villa v. U.S., Case No. 22-5437, 2023 USApp LEXIS 12 (6th Cir, Jan. 3, 2023)]

The Court should pay close and particular attention to McAllister's documented claims of misrepresentations and misconduct by Government witnesses including Agent Fernald, Julie Mayfield, and now, Jimmy Ardoin. The Court should also note Ardoin's 'cute' play with words including "[he] 'almost' assuredly" reviewed all discovery and "[his] 'team' of lawyers, including one associate...." [emphasis added]

Finally, considering the above along with McAllister's pro se and incarcerated status, an evidentiary hearing and appointment of counsel should be granted to conduct further discovery because McAllister can not reasonably or succesfully proceed otherwise.

## REPLY TO: Claims 1 and 2

The issues regarding the investigation and experts, or lack thereof, are best highlighted by Ardoin's need to make misrepresentations in affidavit which are addressed in the REPLY TO: Ardoin's Affidavit. The Government argues that McAllister should identify a specific expert and therefore, considering McAllister's pro se and incarcerated status, should support the request for an evidentiary hearing and assignment of counsel to resolve the questions of fact.

## REPLY TO: Claim 3

The witness affidavits are self-explanatory and go into great detail regarding the issues that would have been addressed. The common theme in each of these affidavits is the lack of interest in investigating by Ardoin and the Government. An evidentiary hearing should be granted to allow for subpoenas and other witness statements.

**REPLY TO: Claim 4**

**Margin Analysis**

The Government claims that Ardoin was not ineffective because he 'inquired' about different [margin] scenarios and that Agent Fernald testified that "3% or 4% scenarios were not run because there was 'no evidence to suggest there was a 3 or 4 percent commission.'" However, Ardoin's 'inquiry' was ineffective because he failed to impeach the agent's testimony with the agent's own work product showing he had run multiple scenarios including 3% scenarios. [See: Exhibit B]

Ardoin's failure to impeach Agent Fernald's misrepresentation allowed the "very conservative" $16M 'misappropriated funds' narrative to stand which was critical to the verdict, sentence and restitution.

Ardoin had no strategic reason for failing to use this evidence, the Texas Franchise and Sales Tax reports, and a financial analysis using the Summary and Margins Report (actual transaction data) to impeach Government witnesses including Agent Fernald's 2% margin assumption and Julie Mayfield's "no margins report" and "no margins on catalog orders."

The Government does not refute the importance of the margin calculations. An investigation and expert evaluation of actual transaction data and other reports would show that a financial turnaround had begun in 2011.

### Julie Mayfield's Letter

The timing of Julie's sentiments regarding McAllister's 'pure heart' (intent) was important at trial and especially during closing arguments.

Mr. Guess: "I want you to remember, though, the <u>one thing from Julie Mayfield</u>, it was **very important**, Mr. Ardoin asked you: 'Do you think he acted with a pure heart?' And what was the question when I came back after that?

'Do you think he acted with a pure heart <u>after the October 2012 meeting</u>.'"

The contents and timing of the letter shows that Julie misrepresented her change of sentiment because it clearly wasn't because of the 2012 meeting. After the 2012 meeting sh sends the letter to McAllister thanking him, wishing him and his family "the best", and even writes:

"<u>I do really hope you 'win'</u>." [emphasis added]

The content and timing of the letter impeaches Mayfield's testimony and directly contradicts the Government's factual narrative. [see Exhibit A] The letter and Government misconduct regarding Julie's testimony should be further evaluated in an evidentiary hearing.

14

### House Photos - 'worth a thousand words'

The Government argues that "the record thus proves that the <u>photos</u> at issue were photos of the house that McAllister purchased" in 2009. However, the record shows that the house photographed was not the "same" but substantially DIFFERENT because of substantial improvements made by the new owners especially to the exterior including an outdoor living area and kitchen, pool, spa, and sport court. Publicly available tax records show that the house in the photos was a $1.5M house - a $600K DIFFERENCE or 70% building improvement - with major visual 'luxurious' improvements. [See: Exhibits C1-3]

The jury was not informed that the house they were viewing in the photos was a materially different house -especially visually. The jury was only told that the photos were taken after McAllister no longer lived in the house and the jury had no way to know of the substantial and material DIFFERENCE, especially visually. Ardoin failed to object to the erroneous photos or to at least impeach the Government's misconduct. The erroneous photos helped the Government further a false factual narrative of McAllister's (and family) enrichment.

### Credit Card Loan

The Government argues that Ardoin was not ineffective because he "did in fact <u>question</u> the witness" about the credit card reimbursements however Ardoin was ineffective because he

15

didn't impeach the Government's witnesses with available defense witness testimony and actual transaction data showing the $500K credit card 'over-payment' to McAllister was in fact an incomplete reconciliation project.

Julie Mayfield testified that she performed the analysis but Natasha Bernal would have testified that she worked for months on the project. Furthermore, Natasha says that she informed Randy and Julie that it was incomplete but she was told to turn over her incomplete work. In her affidavit, Natasha states "[t]he ending balance was in the neighborhood of $500,000 and Julie & Randy formalized this balance into a loan...."

Furthermore, a forensic accounting analysis of the existing evidence will show that McAllister was under-reimbursed not 'over-paid' as the Government said. Additionally, when considering the deductions of more than $100K from McAllister's payroll which the Government did not account for, the Government's claims are even more certainly erroneous.

Ardoin had failed to impeach Julie Mayfield's testimony with the Insperity payroll reports and Natasha Bernal's testimony. The Government was allowed to use the credit card issue to further its false narrative of McAllister's (and his family) enrichment at the expense of the customer.

**REPLY TO: Claim 5**

McAllister disputes Ardoin's claim that he told McAllister not to testify. Associate attorney Tiffany Raush should be called to testify regarding Ardoin's characterization of events and an evidentiary hearing should be granted, if necessary.

McAllister would have testified to his lack of knowledge of the incoming wire related to Charges Two and Three, which Natasha Bernal also describes. Also as Bernal would have testified, McAllister would have testified to the circumstances around the last payments to employees including himself and described in detail how they were intended to support the bankruptcy reorganization efforts. McAllister disputes the characterization that he was told not to by an attorney which would have also been confirmed by other witnesses, including Dan Bensimon, in the bankruptcy process.

**REPLY TO: Claim 6 and 7**

The Court should consider the collective effect of the claims which Movant intends Claims 6 and 7 to represent under 'cumulative error'.

Ardoin's failure to prepare McAllister's case allowed for the failure to: (i) thoroughly investigate or hire a qualified investigator; (ii) hire financial experts; (iii) interview, secure, and call defense witnesses; (iv) use important and exculpatory evidence; and (v) reasonably allow McAllister to testify on his own behalf.

The collective effect of these failures was that Ardoin failed to impeach the Government's case with the true factual narrative and dramatically different evidentiary picture that showed a company **decreasing** its net customer obligations beginning in 2011.

The verdict and sentence were highly impacted by the Government's false narrative that McAllister continued to lose money and was merely spending customer funds on other things besides metals. However, evidence shows that the net customer obligations only increased by less than $1.5M during the relevant period and had actually decreased beginning in 2011 shortly after McAllister regained operational control. The restitution amount is directly affected by this analysis and as a result of Ardoin's failures. 'Ardoin's data-driven analysis' that the Government refers to in its response was not a report by a qualified fiancial expert but merely a document McAllister created in desparation to show Ardoin the restitution amount being considered was erroneous.

## CLOSING

In consideration of the foregoing, I pray that the Court will grant an evidentiary hearing, appointment of counsel, vacate or set aside my sentence, or any other relief the Court can provide.

On this 31st day of January, 2023.

Respectfully Submitted by:

_____
Charles McAllister, pro se
#00222-480 Montgomery FPC
1001 Willow Street
Montgopmery, Alabama 36112

**CHARLES McALLISTER #00222-480**
Montgomery Federal Prison Camp
1001 Willow Street
Montgomery, Alabama 36112

7015 1730 0000 4660 1898

CERTIFIED MAIL

CLERK - U.S. District Court
U.S. Courthouse - WDTX
501 W. 5th AVE
Suite 1100
Austin, TX 78701